UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|                          |   |                    |
|--------------------------|---|--------------------|
| SCOTT VENTURA,           | : |                    |
|                          | : |                    |
| Plaintiff,               | : | CIVIL NO.          |
|                          | : |                    |
| v.                       | : |                    |
|                          | : | 3:06 CV 630 (EBB)  |
| TOWN OF MANCHESTER       | : |                    |
| MARK MONTMINY            | : |                    |
| HOWARD BEELER,           | : |                    |
|                          | : |                    |
| Defendants.              | : |                    |

## **RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE**

Plaintiff Scott Ventura ("Plaintiff" or "Ventura") a former police officer, brings this four-count complaint against his former employer, the Town of Manchester (the "Town"), and his supervising officers, Captain Mark Montminy ("Montminy") and Sergeant Howard Beeler ("Beeler") of the Manchester Police Department ("MPD"). Counts One and Two are actions pursuant to 42 U.S.C. § 1983 to redress violations of Plaintiff's rights under the First and Fourteenth Amendments, respectively; Count Three is an action pursuant to 42 U.S.C. § 1985 alleging that the individual defendants conspired to deprive Plaintiff of his rights and privileges as a U.S. citizen; and Count Four asserts a claim under Conn. Gen. Stat. § 31-51q. Defendants have moved for summary judgment on all claims.

Currently pending before the court are (1) Defendants' motion for summary judgment [Doc. No. 75] and (2) Defendants' motion to strike portions of Plaintiff's Local Rule 56(a)(2) Statement and affidavit submitted in support of his opposition to Defendants' motion for summary judgment. [Doc. No. 84]. Defendants have also filed a motion to supplement their memorandum for summary judgment with recent legal authority. [Doc. No. 88]. For the following reasons, Defendants' motion to strike [Doc. No. 84] is GRANTED IN PART and DENIED IN PART, and Defendants' motion for summary judgment [Doc. No. 75] is GRANTED IN PART and DENIED IN PART. Defendants' motion to supplement their memorandum [Doc. No. 88] is GRANTED.

## **Motion to Strike**

### **A. Standard of Review**

Fed. R. Civ. P. 56(e)(2) provides that "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Local Rule 56(a)(3) states that "[e]ach statement of material fact by a movant in a Local Rule 56(a)1 Statement, and each denial by an opponent in a Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2)

evidence that would be admissible at trial."

Courts in this district differ on whether a motion to strike is appropriate during the summary judgment process. Compare Newport Electric, Inc. v. Newport Corp., 157 F. Supp. 2d 202, 208 (D. Conn. 2001) (stating that a motion to strike is the proper vehicle for a movant to challenge evidence submitted in opposition to a motion for summary judgment) with Martin v. Town of Westport, ---F.Supp.2d ----, 2008 WL 2388913, at *3 (D. Conn. 2008)(stating that "in the context of summary judgment, motions to strike are unnecessary and produce only redundant statements by the court that it has not relied on such inadmissible evidence in deciding the summary judgment motion") (internal citations and quotation marks omitted) and Dragon v. I.C. System, Inc., 241 F.R.D. 424, 426 (D. Conn. 2007) (viewing summary judgment briefing as an adequate and appropriate way to challenge the validity of an affidavit, but recognizing that "the federal rules provide no other technique for challenging affidavits, . . . [and that] courts have been willing to view motions to strike as calling the propriety of affidavits into question") (internal citations and quotation marks omitted).

The court will consider Defendants' motion to strike, especially given that there is no dispute that "[a] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v.

<u>N.Y.C. Dept. of Corr.</u>, 84 F.3d 614, 619 (2d Cir. 1996); <u>see also</u> <u>Buttry v. General Signal Corp.</u>, 68 F.3d 1488, 1493 (2d Cir. 1995) ("it is well-settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

**B. Discussion**

In the instant case, Defendants maintain that ¶¶ 16, 20, 23, 35, 43, 44, 46, 47, 28, 33, and 76 of Plaintiff's affidavit submitted in support of his opposition to Defendants' motion for summary judgment contradict his prior deposition testimony, and should be stricken as a result. After reviewing these paragraphs and the relevant deposition testimony, Defendants' motion to strike is GRANTED IN PART and DENIED IN PART.

**Paragraph 16**

Paragraph 16 of Plaintiff's affidavit states that "[he] did not tell Captain Abbie that [he] suspected Sergeant Marvin was defrauding the town by putting in for overtime he did not actually work." Ventura Aff. at ¶ 16 (Pl. Ex. A)[1]. This statement refers to a July or August 2004 meeting between Captain Abbie and Plaintiff about Sergeant Marvin's abusive and bullying behavior. In his deposition testimony about this meeting, Plaintiff stated that he spoke to Captain Abbie about Sergeant Marvin's abusive

---

[1] "Pl. Ex." refers to the exhibits attached to Plaintiff's memorandum in opposition to Defendants' motion for summary judgment.

behavior, as well as "other things, such as, my suspicion with his altering of time and how he could work overtime, but he would order us to work for free.  I remember saying, I am not that sure but I think that's slavery.  John Marvin told us, if you don't volunteer your time, I will shove you back to patrol.  So it's my way or the high way."  Ventura Depo. at 25-26 (Pl. Ex. C).

Defendants argue that Plaintiff's deposition testimony that he raised his "suspicion with [Sergeant Marvin's] altering of time" refers to Sergeant Marvin's theft of overtime.  However, Plaintiff maintains that his testimony is ambiguous on this point, and more logically refers to Sergeant Marvin altering the hours that his subordinate officers actually worked and for which they should have been paid. Pl's. Mem. in Opp. to Mot. to Strike at 7 [Doc. No. 86]. In other words, he maintains that he was testifying only about Sergeant Marvin working overtime (e.g. working and being paid for overtime) while forcing the traffic officers to "volunteer" their time after work (e.g., work for free).

However, in a subsequent meeting with Captain Montminy, Plaintiff referred to the fact that he had previously brought up Sergeant Marvin's theft of overtime in his meeting with Captain Abbie.  Ventura Depo. at 135 (Pl. Ex. C) ("[a]nd then while I was sitting there, *because it came up in Captain Abb[ie]'s interview*, I said, well, I have a suspicion, and my exact words were, I suspect that Sergeant John Marvin is on the books and working when

he is not here.") (emphasis added). Defendants also cite Plaintiff's interrogatory responses, where he stated that at his meeting with Captain Abbie, he informed Captain Abbie "of John Marvin's abusive and demeaning behavior, of instances where Marvin ordered the officers in the traffic division to 'volunteer' their time, and thus work without pay . . . of his fear of retaliation by Marvin, *and* of Marvin's abuse of department overtime." Defs.' Reply to Pl's. Opp. to Defs. Mot. for Summ. J., Ex. 2 at 9 [Doc No. 87]. This response clearly distinguishes between Sergeant Marvin's abuse of department overtime and his requirement that traffic unit officers "volunteer" their time. For these reasons, Defendants' motion to strike ¶ 16 of Plaintiff's affidavit is GRANTED.

**Paragraphs 20, 23**

In ¶ 20 of Plaintiff's affidavit, he states that he "was not ordered to speak with Captain Montminy." Ventura Aff. at ¶ 20 (Pl. Ex. A). In ¶ 23, he states that "[d]uring this conversation, I voluntarily told Captain Montminy that I suspected Sergeant Marvin was stealing overtime." Id. at 23. These statements refer to an October 2004 meeting between Plaintiff and Captain Montminy.

Defendants argue that these statements conflict with Plaintiff's deposition, where he testified that he was "summoned" to a meeting with Captain Montminy and that the purpose of the meeting was for Captain Montminy to follow up on the issues associated with Sergeant Marvin. Ventura Depo. at 134, 138 (Pl.

Ex. C).

Plaintiff makes the following arguments in response. First, he argues that being "summoned" to a meeting is distinct from being ordered to speak at the meeting. Thus, he maintains that his deposition statement that he was "summoned" to the October 2004 meeting is fully consistent with his affidavit statement that he spoke voluntarily at this meeting. Second, Plaintiff argues that Captain Montminy was not seeking information about Sergeant Marvin's theft of overtime in this meeting, and that the issue would not even have come up had Plaintiff not volunteered his suspicions.

In his deposition testimony, Plaintiff stated: "[a]nd then while I was sitting there, because it came up in Captain Abb[ie]'s interview, I said, well, I have a suspicion, and my exact words were, I suspect that Sergeant John Marvin is on the books and working when he is not here. And the other officers chimed in, and, I followed that with examples of why I felt that way." Ventura Depo. at 135 (Pl. Ex. C). Plaintiff also testified that Captain Montminy told him not to repeat the overtime theft accusation without solid evidence, and that "we were just asking him to look into it, keep an eye on it." Id. at 137. This deposition testimony does not contradict Plaintiff's affidavit statement that he voluntarily raised the theft of overtime issue, rather than being ordered to speak about it. Thus, the Court

DENIES Defendants' motion to strike ¶¶ 20 and 23 of Plaintiff's affidavit.

**Paragraph 35**

Paragraph 35 of Plaintiff's affidavit states that he "was not ordered to speak during the meeting with Chief Berry; rather I spoke voluntarily". Ventura Aff. at ¶ 35 (Pl. Ex. A). This statement refers to a February 2005 meeting between Chief Berry and the four officers in the Traffic Unit.

In his deposition, Plaintiff testified that, immediately prior to this meeting, he and the other traffic unit officers again discussed their suspicions that Sergeant Marvin was continuing to steal overtime. Plaintiff testified that he remembered telling Officer Poist that they needed to all step forward, and that Plaintiff was the one who "pulled Captain Reeves out [of training] and informed him what was going on." Ventura Depo. at 148 (Pl. Ex. C). Later on that day or the next, the four officers, along with Captains Reeves, Abby and Montminy, met with Chief Berry. Id. at 151.

Plaintiff argues that it is illogical to suggest that he was "ordered" to speak at a meeting that he and the other officers requested. Defendants note that, during this meeting, Chief Berry told Plaintiff that he was "going to do a thorough investigation and you are going to participate." Id. at 153-154. However, Plaintiff's deposition testimony suggests that he and the other

officers spoke about Sergeant Marvin before Chief Berry made this statement.   See id. at 152-53 (Plaintiff testifying that the officers made their complaints, that Chief Berry became upset, that Plaintiff asked him if it was the first time he had heard about these allegations against Sergeant Marvin, that it "went downhill from there", and then that Chief Berry said that "we are going to do a thorough investigation and you are going to cooperate."). Thus, Plaintiff's affidavit statement does not directly contradict his deposition testimony.   Defendants' motion to strike ¶ 35 is DENIED.

**Paragraphs 43, 44, 46, and 47**

Paragraphs 43, 44, 46, and 47 of Plaintiff's affidavit relate to his involvement in the criminal investigation of Officer Lowry:

> 43. On March 4, 2005, as part of the criminal investigation into Officer Lowry, Lieutenant San Antonio asked me to give a statement about Officer Lowry.
>
> 44. I declined to give a statement at that time.
>
> 46.  On March 14, 2005, I voluntarily sought out Lieutenant San Antonio and asked to give a statement.
>
> 47.  At no time was I ordered to give a statement; I chose voluntarily to come forward as a witness.

Plaintiff's deposition testimony describes three interactions with Lieutenant San Antonio regarding the Lowry investigation. Initially, Captain Reeves called Plaintiff while he was in Traffic Court and told him he needed to report back to the MPD and see

Lieutenant San Antonio. Ventura Depo. at 110 (Pl. Ex. C). When
asked if he felt that he could have refused to speak to Lieutenant
San Antonio, Plaintiff replied: "[w]ell, a lieutenant wants to talk
to you, then it's a direct order." Id. During this first meeting
with Lieutenant San Antonio, Plaintiff indicated that he would
cooperate in the Lowry investigation, but wanted to speak to his
union representative first. Id. at 109.

A few days later, a no-contact order was issued against
Plaintiff. Id. Plaintiff testified that "they issued [the] no-
contact order against me without getting my side of the story and
I said, listen, I want to sit down and talk to you guys. I felt I
was, this is what you want, I'll give you the interview. You
refused to investigate my claim that I am innocent. [Officer Lowry]
is constantly contacting me and this no-contact order is false
accusations. So if I got to go on the record in an interview, then
that's what I'll do." Id. at 106-107.

A few days after the no-contact order, Plaintiff gave a
statement to Lieutenant San Antonio. In his deposition, the
following colloquy took place regarding this statement:

Q:   Okay. Now, I guess you testified earlier that as part of the
     Lowry investigation, Lieutenant San Antonio originally came to
     you asking for a statement and at that time you did not give
     a statement?
A:   That's correct. I did not.
Q:   Okay. How did it come about that you ultimately gave a
     statement?
A:   I went to Lieutenant San Antonio freely of my own accord.
Q:   So when you finally did give a statement, did he come to you
     again asking for a statement, or did you go to him saying, I

```
          want to give a statement?
A:        The second time I went to him.  I believe I called him at his
          house and said, I want to give a statement. Id. at 300.
```

Plaintiff ultimately gave a statement, which was then typed up by Lieutenant San Antonio and signed by Plaintiff.  Id. at 111.

Defendants argue that Plaintiff's deposition testimony conflicts with his affidavit statements, and that "at no time did the Plaintiff testify that he was free to disregard the order from [Lieutenant] San Antonio or that he was absolved of the responsibility to participate in the investigation."  Reply to Pl's. Opp. to Defs'. Mot. to Strike at 5 [Doc. No. 87].  Defendants point to Plaintiff's testimony that he was called into the initial meeting with Lieutenant San Antonio, and his admission that when "a lieutenant wants to talk to you, it's a direct order."  Id.

However, Plaintiff also testified that he "went to Lieutenant San Antonio freely of [his] own accord" when he ultimately did give a statement, which does not directly contradict ¶ 46 of his affidavit statement that he "voluntarily sought out Lieutenant San Antonio."  He testified that, at his first meeting with Lieutenant San Antonio, he expressed his desire to speak to a union representative before giving a statement, which does not contradict ¶ 44 of his affidavit statement that he "declined to give a statement" at that time.  Moreover, ¶ 43 of Plaintiff's affidavit, where he stated that he was "asked" to give a statement during his initial meeting with Lieutenant San Antonio is not inconsistent

with his testimony that he was "ordered" to attend this meeting. Thus, Defendant's motion to strike ¶¶ 43, 44, and 46 of Plaintiff's affidavit is DENIED.

Defendants maintain that ¶ 47 of Plaintiff's affidavit, where he stated that he "chose voluntarily to come forward as a witness", is contradicted by his deposition testimony stating that he asked Lieutenant San Antonio to tell officers who were harassing him that he was ordered to cooperate in the investigation. Ventura Depo. at 16 (Pl. Ex. C) (Plaintiff testifying that he expressed concern for his safety and asked Lieutenant San Antonio to "please confront [the other officers] and tell the guys, hey, I was ordered to cooperate with the investigation, it was the right thing to do, and I did and I came forward, again, not only as an officer but as a taxpayer" and that Lieutenant San Antonio's response was to say that Plaintiff should "go live your life and be happy, put this behind you"). Indeed, Plaintiff's deposition testimony is not clear on this point. While Defendants rightly point out that Plaintiff testified that he asked Lieutenant San Antonio to tell his fellow officers that he was ordered to participate in the Lowry investigation, Plaintiff also testified that his participation was voluntary. See, e.g. Ventura Depo. at 300 ("I went to Lieutenant San Antonio freely of my own accord."). Therefore, Defendant's motion to strike ¶ 47 is DENIED.

**Paragraphs 28, 33, and 76**

Defendants move to strike ¶¶ 28, 33, and 76 of Plaintiff's affidavit on the grounds that they contain legal conclusions that are not supported by the relevant evidence.

Paragraphs 28 and 33 state the following:

28.   I believed that Sergeant Marvin's behavior was wrong, and as a citizen and taxpayer of Manchester I felt an obligation to do something about it.

33.   I was not ordered to speak to Captain Reeves; I did so because I felt it was the right thing to do, and because, as a taxpayer of Manchester and a citizen, I believed the integrity of the department was being damaged by an officer who was defrauding the town.

"Legal conclusions offered by both lay and expert witnesses are inadmissible because it is not for a witness to instruct the court on the law." <u>Brown-Criscuolo v. Wolfe</u>, No. 3:05cv01486, 2007 WL 2439421, at *2 (D. Conn. Aug. 24, 2007). To the extent that these paragraphs assert that Plaintiff was "acting as a citizen" for the purposes of the court's First Amendment analysis, these paragraphs are inadmissible.

Paragraph 76 states:

76.   The Town of Manchester contested my application for unemployment benefits, although it did not contest Officer Lowry's or Ms. Cushman's. It is a documented fact that the town made written false statements to the labor dept. so I would be denied unemployment benefits.

Defendants argue that Plaintiff's statement that the Town of

Manchester made written false statements is a conclusory statement not supported by any admissible evidence.

The "written false statements" that Plaintiff references appear to be the Town's assertion, in opposing Plaintiff's application for unemployment benefits, that Plaintiff had voluntarily resigned. See Pl's. Local Rule 56(a)(2) Statement at ¶ 40 (admitting that "the Town of Manchester opposed his application for benefits, asserting that he had resigned voluntarily," but denying Defendants' statement that his resignation was voluntary).

Although Plaintiff is free to make factual assertions related to this issue, the use of the phrase "documented fact" suggests that it is already established that the Town made false statements in opposing Plaintiff's application for unemployment benefits. Because there is nothing to support this statement, the court will disregard this portion of ¶ 76.

In sum, Defendants' motion to strike is GRANTED IN PART and DENIED IN PART. In addition, the court will disregard those portions of Plaintiff's 56(a)(2) Statement that are not supported by admissible evidence.

## II. Motion for Summary Judgment

### A. Standard of Review

The standard for summary judgment is well established. A moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law", while an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986); see also Konikoff v. Prudential Ins. Co. Of Am., 234 F.3d 92, 97 (2d Cir. 2000). Upon motion, and following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any." FED. R. CIV. P. 56©. The evidence of the non-moving party is to be believed, Anderson, 477 U.S. at 255, 106 S.Ct. at 2513, and "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v.

_Diebold, Inc._, 369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962).
However, the non-movant may not rest upon the mere allegations or
denials of his pleading, see FED. R. CIV. P. 56(e), and "must do more
than simply show that there is some metaphysical doubt as to the
material facts."   _Matsushita Electric Industrial Co., Ltd. v._
_Zenith Radio Corp._, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986).
Instead, the non-moving party "must offer some hard evidence
showing that its version of the events is not wholly fanciful."
_D'Amico v. City of New York_, 132 F.3d 145, 149 (2d Cir. 1998).

**B. Factual Background**

The Court sets forth only those facts deemed necessary to an
understanding of the issues raised in, and decision rendered on,
this motion for summary judgment.  The following factual summary is
based on Defendants' Local Rule 56(a)1 Statement of Material Facts
["Defs.' 56(a)1 Statement"], Plaintiff's Local Rule 56(a)2
Statement of Material Facts ["Pl.'s 56(a)2 Statement"],and
accompanying affidavits, depositions and exhibits, to the extent
that they are admissible evidence.   For the purposes of the
instant motion for summary judgment, the Court accepts the facts
undisputed by the parties as true and resolves disputed facts in
favor of the non-moving Plaintiff, where there is evidence to
support his allegations.  Disputed facts are noted _infra_.

Plaintiff was employed by the Town of Manchester as a police

officer, and was assigned to the Traffic Unit.  Defs.' 56(a)1
Statement at ¶ 1; Ventura Aff. at ¶ 5 (Pl. Ex. A).  The Traffic
Unit consisted of four officers and one sergeant, and was
responsible for enforcing traffic laws within the Town of
Manchester and investigating traffic accidents involving serious
injury or death.  Ventura Aff. at ¶ 6 (Pl. Ex. A); Poist Depo. at
8 (Pl. Ex. B).  Plaintiff's fellow officers were Donald Poist, Guy
Beck and Paul Gilligan.  All four officers were supervised by
Sergeant John Marvin.  The Traffic Unit was considered a more
desirable assignment than the Patrol Unit for several reasons,
including greater flexibility in scheduling, the availability of
additional overtime, and the provision of take-home cars and
motorcycles.  Poist Depo. at 8-9, 14 (Pl. Ex. B); Ventura Depo. at
251-53 (Pl. Ex. C).

Sergeant Marvin was verbally abusive of the officers he
supervised.  Defs.' 56(a)1 Statement at ¶ 2;  Poist Depo. at 9-12
(Defs. Ex. A)[2]; Gilligan Depo. at 11-14 (Defs. Ex. B); Beck Depo.
at 10-11 (Defs. Ex. C).  Sergeant Marvin's behavior included
disparaging comments on a near daily basis, and throwing things at
his subordinates.  Beck Depo. at 10-11 (Defs. Ex. C).  Sergeant
Marvin also required the Traffic Unit Officers to work events

---

[2]"Defs. Ex." refers to the exhibits attached to Defendants' memorandum
in support of their motion for summary judgment.

without pay on their days off.  <u>Id</u>. at 13. In either June or July

of 2004, Poist told the other officers in the Traffic Unit that he

had "had it" with Sergeant Marvin's abuse and wanted to file a

formal complaint.  Ventura Depo. at 22 (Defs. Ex. D).  Beck,

Gilligan, and Plaintiff did not want to make a complaint at this

point.  <u>Id</u> (Plaintiff testifying that "[w]e really just wanted to

let sleeping dogs lie.  Although we were fed up and aggravated with

Sergeant Marvin as well, we knew the ramifications and outcome,

what the outcome would be if we testified against a sergeant, such

a senior sergeant as John Marvin.").  Poist complained to Captain

Roy Abbie about Sergeant Marvin's behavior.  Defs.' 56(a)1

Statement at ¶ 4; Poist Depo. at 17-21 (Pl. Ex. B); Ventura Depo.

at 23-24 (Pl. Ex. C).  Thereafter, Captain Abbie summoned Plaintiff

to his office to ask if Plaintiff could confirm what Poist had

said.  Defs.' 56(a)1 Statement at ¶ 5;  Ventura Depo. at 24 (Defs.

Ex. D); Ventura Aff. at ¶ 13 (Pl. Ex. A).  Plaintiff informed

Captain Abbie that he did not want to get involved in Poist's

complaint about Sergeant Marvin.  Defs.' 56(a)1 Statement at ¶ 6.

 Nonetheless, Captain Abbie ordered Plaintiff to speak about

Sergeant Marvin's conduct.  Defs.' 56(a)1 Statement at ¶ 7; Ventura

Aff. at ¶ 13 (Pl. Ex. A).  Plaintiff related several instances of

Sergeant Marvin's verbally abusive behavior. Ventura Depo. at 25

(Defs. Ex. D).  Plaintiff testified in his deposition that Captain

Abbie starting laughing after hearing about one of these instances. Id.

After Captain Abbie spoke to Plaintiff, he issued a memorandum to Sergeant Marvin stating that any further abusive behavior would result in progressive discipline. Defs.' 56(a)1 Statement at ¶ 8; Memo from Captain Abbie to Sergeant Marvin (Pl. Ex. D).

In October 2004, Defendant Captain Montminy met with Plaintiff, Poist and Gilligan to discuss whether Sergeant Marvin's conduct had improved. Plaintiff denies Defendants' assertion that he was "ordered" to attend this meeting. Pl's. 56(a)(2) Statement at ¶ 9 (denial); Ventura Aff. at ¶ 20 (Pl. Ex. A). All three officers still had complaints about Sergeant Marvin's behavior. Defs.' 56(a)1 Statement at ¶ 10. In addition, the officers stated that they suspected that Sergeant Marvin was stealing overtime by putting himself on the books as working when he was not. Id. Plaintiff disputes Defendants' claim that he could not provide specific evidence of Sergeant Marvin's overtime theft. Pl's. 56(a)(2) Statement at ¶ 11; see also Ventura Depo. at 139-140 (Defs. Ex. D) (Plaintiff's testimony that while he could not provide "specific dates", he "reported specific instances" and examples, including occasions when Sergeant Marvin could not be found when he was supposed to be working). According to Plaintiff, "Captain Montminy ended the meeting by saying I should

19

never repeat my accusations against Sergeant Marvin ever again, about not being at work while he is being paid," unless the traffic unit officers had "solid evidence" to prove it. Ventura Depo. at 136-137 (Pl. Ex. C). In addition, Plaintiff testified that the officers were "just asking [Captain Montminy] to look into it, keep an eye on it"). Id. at 137.

In February or March 2005, Poist discussed additional proof of Sergeant Marvin's theft of overtime with Plaintiff, including evidence that Sergeant Marvin had altered his time card. Defs.' 56(a)1 Statement at ¶ 12; Ventura Depo. at 146-48 (Defs. Ex. D). Plaintiff then pulled Captain Reeves out of a training session, and a meeting occurred between Captain Reeves and the four Traffic Unit officers Id. While Plaintiff admits that there was no "spokesperson" during this meeting, he denies Defendants' assertion that he was "merely the one who went and got Captain Reeves," and maintains that he was an active participant in this meeting. Pl's. 56(a)(2) Statement at ¶ 13, citing Ventura Depo. at 150-151 (Pl. Ex. C).

Shortly thereafter, the four officers met with Chief Berry. Defs.' 56(a)1 Statement at ¶ 14. Also present at this meeting were Captains Reeves, Abby and Montminy. Ventura Depo. at 151 (Defs. Ex. D). Each of the Traffic Unit officers spoke about the issues with Sergeant Marvin. Defs.' 56(a)1 Statement at ¶ 15; Ventura

Depo. at 152-157 (Defs. Ex. D). Plaintiff became upset while speaking about Sergeant Marvin's behavior, and asked Chief Berry whether it was the first time he had heard of these allegations. Id. at 153. Plaintiff testified that Chief Berry became upset when he was asked this question, and that things "went downhill", with Chief Berry stating that he would do a thorough investigation and Plaintiff would cooperate. Id. Plaintiff's response was to tell Chief Berry that "if [he] want[ed] to know what's in this investigation, check what's in the last investigation." Id. Plaintiff also told Chief Berry to "consider this my two-weeks' notice", which the Chief did not accept. Id. at 156. Plaintiff testified in his deposition that he made this statement "out of complete frustration, spur of the moment." Id. He testified that he was frustrated because it had taken nearly seven months to get in front of a Chief, and because it appeared to him that the Chief was hearing about these allegations for the first time. Id. at 152. As a result of this meeting, Chief Berry placed Sergeant Howard Beeler in charge of the Traffic Unit, and ordered an investigation of Sergeant Marvin. Defs.' 56(a)1 Statement at ¶ 16-17. The four Traffic Unit officers participated in this investigation of Sergeant Marvin, and were each interviewed by Lieutenant Joseph San Antonio. Defs.' 56(a)1 Statement at ¶ 18. Plaintiff disputes Defendants' claim that his participation in the

investigation was based upon an order by Chief Berry. Pl's. 56(a)(2) Statement at ¶ 18, <u>citing</u> Ventura Aff. at ¶ 39 (Pl. Ex. A). The criminal investigation of Sergeant Marvin determined that there was probable cause to believe that he was guilty of the crime of "Defrauding a Public Community". <u>See</u> Pl. Ex. I; Pl. Ex. J. Instead of being prosecuted, however, Sergeant Marvin was permitted to retire. Berry Depo. at 33-34 (Pl. Ex. M).

In the fall of 2004, the Manchester Police Department began a narcotics investigation centered around a sports bar in Manchester. Incident Supplement Report, 48271 (Pl. Ex. O). During the course of this investigation, officers received information that Officer Susan Lowry and Dawn Cushman, the records manager for the Manchester Police Department, were buying and using cocaine. Incident Supplement Report, 47041 (Pl. Ex. P). Prior to the investigation, Plaintiff had had a long term romantic relationship with Officer Lowry, which ended when she refused his proposal of marriage. Defs.' 56(a)1 Statement at ¶ 24.

On March 4, 2005, Lieutenant San Antonio approached Plaintiff to interview him about Officer Lowry. Ventura Depo. at 109 (Defs. Ex. D). Plaintiff stated that he would cooperate, but wanted to speak to his union representative first. <u>Id</u>. When asked in his deposition if he could have refused to speak to Lieutenant San Antonio, Plaintiff responded that "a lieutenant wants to talk to

you, then it's a direct order." Id. at 110. Plaintiff testified that he later sought out Lieutenant San Antonio and volunteered to give a statement. Ventura Depo. at 300 (Pl. Ex. C) ("[t]he second time I went to him. I believe I called him at his house and said, I want to give a statement."). Plaintiff disputes Defendants' claim that he was required to speak to Lieutenant San Antonio and did not have a choice in the matter. Pl's. 56(a)(2) Statement at ¶ 22, citing Ventura Depo. at 300 (Pl. Ex. C); see also San Antonio Depo. at 45 (Pl. Ex. L).

Shortly after Plaintiff gave his statement in the Lowry investigation, he learned that Officer Lowry had made statements to two other officers alleging that Plaintiff was making false accusations against her and engaging in harassing behavior. Plaintiff denied these allegations and claimed that Lowry was actually contacting him. As a result, the Manchester Police Department issued a "no-contact order" to both parties. See Memorandum from Sergeant Foran to Lieutenant San Antonio (Pl. Ex. Q). Plaintiff disputes Defendants' claim that this no-contact order was for the benefit of both parties, Defs.' 56(a)1 Statement at ¶ 27, asserting that it placed him at risk of being arrested if he was accused of contacting Officer Lowry. See Memorandum from Sergeant Foran to Lieutenant San Antonio (Pl. Ex. Q). A few days later, Plaintiff wrote a memo to Chief Berry in which he listed

instances where Lowry had contacted him, stated that he feared retaliation by Lowry's current boyfriend, and alleged that Cushman had accessed and allowed Lowry to read the pending investigation against her. Written Statement of Scott Ventura (Pl. Ex. S); Memorandum from Lieutenant San Antonio to Captain Montminy (Pl. Ex. V). During the investigation of Lowry and Cushman, it was determined that Cushman had accessed the case file for the on-going narcotics investigation and shown it to Lowry, had provided information about the investigation to her cocaine dealer and had improperly obtained a handgun license for this dealer. Id; Incident Supplement, No. 48271 (Pl. Ex. U) Lowry and Cushman were not prosecuted, but resigned from the Manchester Police Department. Cushman Resignation Letter (Pl. Ex. W); Lowry Resignation Letter (Pl. Ex. X).

In mid April 2005, an arrestee filed a complaint that Plaintiff had stolen methadone from his vehicle during a traffic stop. Beeler Depo. at 29 (Pl. Ex. K). Sergeant Beeler investigated this complaint. Plaintiff provided Sergeant Beeler with the videotape of the arrest. The videotape showed Plaintiff approach the car, order the occupant to step out, conduct a field sobriety test, and take the person into custody. Id. at 36. The videotape then showed Officer Poist enter the vehicle, remove items, and turn those items over to Plaintiff. Id. at 37. After

24

reviewing this videotape with Plaintiff, Sergeant Beeler searched Plaintiff's police cruiser, where he found Plaintiff's migraine medication. Id. at 40. Sergeant Beeler then searched Plaintiff's desk, where he found a sealed individual packet of Tylenol or aspirin. Id. at 41. Sergeant Beeler confiscated the migraine medication, and, according to Plaintiff, told him that he was "facing a lot of trouble". Ventura Depo. at 213 (Pl. Ex. C). Sergeant Beeler questioned Officer Poist, Plaintiff's back-up on the arrest, who advised him that no medication had been found in the car. Poist Depo. at 73 (Pl. Ex. B). In addition, when Sergeant Beeler told Poist that he had heard him state "here is his medication" on the videotape, Poist corrected him by explaining that he had said "communication", not "medication." Id. Captain Montminy testified that there was no evidence substantiating the arrestee's complaint. Montminy Depo. at 88 (Pl. Ex. G). After finding internet information about the pills recovered from Plaintiff's cruiser, Sergeant Beeler and Lieutenant Neiswanger concluded that the pills were for migraine headaches. Beeler Depo. at 32 (Pl. Ex. K). Sergeant Beeler did not fill out a seized property sheet when he took Plaintiff's pills. Id. at 48. Nor did he write up a report on this incident. Id. at 33 ("[u]nfortunately, I took all this paperwork and put it in my desk with the intent of writing up a conclusion. And it got buried

amongst other papers.").

In late April 2005, Plaintiff requested an extended leave, using accrued vacation and personal time. Ventura Depo. at 238-240 (Pl. Ex. C). Plaintiff spent time in both Connecticut and South Carolina during his leave, and began to look for a job in South Carolina. Id. at 243-244. Plaintiff requested a letter of reference from Chief Berry, and on July 19, 2005, Chief Berry provided him with a positive letter. Ventura Depo. at 20 (Defs. Ex. D). Plaintiff also received a favorable performance evaluation in the spring of 2005. Defs.' 56(a)(1) Statement at ¶ 29.

Plaintiff visited the dentist during his leave. When his dentist contacted the Town of Manchester to verify insurance information, the dentist was allegedly told that Plaintiff was on disability leave because he had been injured on the job. Plaintiff admits that he does not know to whom his dentist spoke. Ventura Depo. at 248-49 (Pl. Ex. C). A similar incident occurred with a Hartford Courant reporter, although Plaintiff admits that he does not know with whom the reporter spoke. Id.

When Plaintiff informed the MPD that he would be returning from his leave in August 2005, Sergeant Beeler initially informed him that he would be returning to the Traffic Unit. Ventura Depo. at 250 (Defs. Ex. D). Shortly thereafter, Sergeant Beeler told Plaintiff that he was being transferred to the Patrol Unit but,

according to Plaintiff, did not tell him why. Id. at 251.

Sergeant Beeler told Plaintiff that he was to report to Captain

Montminy before reporting to the Patrol Unit. Id. Plaintiff

claims that this transfer was retaliatory. Chief Berry testified

that he made the decision to assign Plaintiff to the Patrol Unit

because of staffing shortages in that division. Berry Depo. at 63-

64 (Pl. Ex. M). Captain Montminy testified that he was also

involved in the decision to assign Plaintiff to Patrol. Montminy

Depo. at 92 (Pl. Ex. G). In the Patrol Unit, Plaintiff would be

working under the same sergeants that had worked with Sergeant

Marvin, see Poist Depo. at 75, including, according to Plaintiff,

sergeants that had called him a "rat" and officers that had told

him not to expect backup. Ventura Aff. at ¶ 71 (Pl. Ex. A).

On August 26, 2005, Plaintiff submitted his letter of

resignation with an effective date of September 23, 2005. Officers

Poist, Beck and Gilligan did not resign and remain employed by the

MPD. Defs.' 56(a)1 Statement at ¶ 38.

The Town of Manchester contested Plaintiff's application for

unemployment benefits on the grounds that Plaintiff had resigned

from the position. See Berry Depo. at 74 (Pl. Ex. M). However,

the Town did not contest Officer Lowry's application for

unemployment benefits. See id. at 75. In addition, the Town did

not indicate on Plaintiff's Personnel Activity Form that he was

eligible for rehire, although it had done so for Sergeant Marvin. (Pl. Ex. FF).

The Traffic Unit officers testified they suffered repercussions from their participation in the Marvin investigation. See, e.g. Poist Depo. at 62 (Pl. Ex. B)("[I]t was felt that the traffic members were rats. We had violated the blue wall of silence, the blue line code, or whatever the TV trivia is."); Gilligan Depo. at 48 (Pl. Ex. E) ("things got cold"); Beck Depo. at 53-54 (Pl. Ex. F) (stating that, after the Marvin investigation, the Traffic Unit officers were treated "poorly" by the other officers in the department). Officer Poist testified that he was accused of perjuring himself in court and rigging reports, and that anonymous co-workers had indicated to Sergeant Beeler that they believed he was suicidal. Poist Depo. at 80-81 (Pl. Ex. B).

In addition, Officer Poist testified that Plaintiff's involvement in the Lowry/Cushman investigation had an added effect on him. Poist Depo. at 63 (testifying that "[u]nfortunately for Officer Ventura at that particular time, two other employees were under investigation as well, and that he was involved with that. And I believe it was – it had a compounded effect on him with what was going on in that investigation.").

**B. DISCUSSION**

## I. First Amendment

Plaintiff claims that he was retaliated against, in violation of his rights under the First Amendment, for his participation in the investigations of Sergeant Marvin, Officer Lowry and Dawn Cushman. He alleges the following as examples of this retaliation – (1) the "no-contact" order issued against him; (2) the methadone investigation; (3) harassment by fellow officers, including being denied backup; and (4) his transfer from the Traffic Unit to the Patrol Unit. Plaintiff also argues that he was retaliated against after his resignation, claiming that the Town contested his application for unemployment benefits for retaliatory reasons, refused to indicate on his Personnel Activity Form that he was eligible for rehire and interfered with his ability to find new employment. See Pl's. Mem. in Opp. to Defs.' Mot. for Summ. J. at 8-9 [Doc. No. 79].

A plaintiff claiming retaliation in violation of his First Amendment right to free speech must show that (1) the speech at issue was protected, (2) he suffered an adverse employment action, and (3) there is a causal connection between the speech and the adverse employment action. See Cioffi v. Averill Park Central Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006). With respect to the first prong, the Supreme Court has made clear that the speech of public employees is protected only to the extent that the

29

employee is speaking as a "citizen addressing matters of public concern". <u>Garcetti v. Cellabos</u>, 547 U.S. 410, 417, 126 S.Ct. 1951 (2006).

### a. Whether Plaintiff's Speech was Protected

In <u>Garcetti v. Cellabos</u>, the Supreme Court set forth a two-part inquiry for determining whether public employee speech is protected by the First Amendment. "The first requires determining whether the employee spoke as a citizen on a matter of public concern." <u>Garcetti</u>, 547 U.S. at 418, 126 S. Ct. at 1958. "If the answer is no, the employee has no First Amendment cause of action . . ." <u>Id</u>. In <u>Garcetti</u>, the Court held that "when public employees make statements pursuant to their official duties, the employees are not citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421-22, 126 S.Ct. 1951.

However, if a public employee is found to have spoken as a citizen on a matter of public concern, a court must then ask whether the government employer "had an adequate justification for treating the employee differently from any other member of the general public." <u>Id.</u>, <u>citing</u> <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568, 88 S.Ct. 1731 (1968) (stating that "[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public

concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

Here, Defendants argue that Plaintiff did not engage in protected speech because he was speaking not as a citizen, but rather pursuant to his official duties.

In <u>Garcetti</u>, a deputy district attorney claimed retaliation for writing a disposition memorandum in which he recommended dismissal of a case because of alleged governmental misconduct. The Supreme Court found that the plaintiff had no First Amendment claim, holding that he "did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case." <u>Garcetti</u>, 547 U.S. 410, 422, 126 S.Ct. at 1960. The Court found that the disposition memorandum was written pursuant to the plaintiff's official duties, reasoning that he wrote the memorandum "because that is part of what he, as a calendar deputy, was employed to do." <u>Id</u>. The employer's negative reaction to the memorandum "simply reflect[ed] the exercise of employer control over what the employer itself ha[d] commissioned or created." <u>Id</u>. at 422, 126 S.Ct. at 1960.

Because there was no dispute that the plaintiff in <u>Garcetti</u> wrote the speech at issue pursuant to his employment duties, the Supreme Court found that it had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," but noted that "[t]he proper inquiry is a practical one." <u>Id</u>. at 424, 126 S.Ct. at 1961.

Thus, "[a]s comprehensive as <u>Garcetti</u> is, [lower courts] are still left without a standard or guide to help [them] balance or maneuver through those public statements that may be mixed, or rather disguised because the scope of job responsibilities are not so manifest." <u>Jackson v. Jimino</u>, NO. 1:03-cv-772, 2007 WL 189311, at *16 (N.D.N.Y. Jan. 19, 2007) (finding that material issues of fact existed in determining whether the plaintiff was speaking pursuant to his official job duties); <u>see also</u> <u>Caruso v. Massapequa Union Free Sch. Dist.</u>, 478 F. Supp. 2d 377, 382 (E.D.N.Y. 2007) (stating that "[t]he question of whether an employee speaks pursuant to his official duties is not always easy and <u>Garcetti</u> sets forth no dispositive test.").

Nonetheless, <u>Garcetti</u> did instruct that the proper inquiry into whether speech is made pursuant to an official duty "is a practical one", and that "the listing of a given task in an employee's written job description is neither necessary nor

sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Garcetti, 547 U.S. at 425, 126 S.Ct. at 1961-1962.

Here, Defendants claim that Plaintiff's speech is not protected under Garcetti because it was made at the request of his employer during internal investigations of Sergeant Marvin, Officer Lowry, and Dawn Cushman. Defendants also argue that "[i]t is undisputed that the Plaintiff did not initiate his speech voluntarily, but that he was complying with the order of his employer." Defs.' Mem. in Supp. of Mot. for Summ. J. at 15 [Doc. No. 76].

Plaintiff maintains that there are genuine issues of material fact as to whether he spoke as a citizen, rather than pursuant to his official duties during these investigations, and as to whether his speech was voluntary rather than compelled. Pl's. Mem. in Opp. to Defs.' Mot. for Summ. J. at 12, 16 [Doc. No. 79]. He argues that his job duties focused on enforcing traffic laws, not on internal affairs or fraud investigations. Id. at 15. Plaintiff also distinguishes between his initial speech about Sergeant Marvin's abusive behavior, which he concedes "could arguably be construed as compelled", and his speech about Sergeant Marvin's theft of overtime and Officer Lowry's conduct, which he maintains was voluntary. Id. at 16-17.

Courts in this district have come to differing conclusions about when a public employee's speech concerning workplace misconduct is protected by the First Amendment.

In Barclay v. Michalsky, a nurse claimed that she had been retaliated against for complaining about co-worker misconduct, including the mistreatment of patients and employees sleeping on the job. 451 F.Supp. 2d 386 (D. Conn. 2006). The defendant argued that Garcetti barred the plaintiff's First Amendment claim, citing workplace rules providing that employees were required to report misconduct to their supervisors. Notwithstanding these rules, the court denied the defendant's motion for summary judgment, holding that there was a material issue of fact because "the record [did] not establish incontrovertibly that plaintiff made her complaints . . . as part of the discharge of her duties as a nurse." 451 F. Supp. 2d at 397. Citing Garcetti's instruction that the inquiry into what constitutes an official duty is "a practical one", the court noted the absence of complaint forms and employee training about filing complaints, and cited the plaintiff's supervisor's statement that "we don't do this kind of thing here" in response to plaintiff's complaints. Id at 395-96.

However, the Barclay court reversed its initial decision less than a year later, citing the "Garcetti progeny from the past year." Barclay v. Michalsky, 493 F. Supp. 2d 269, 275 (D. Conn.

34

2007).  The court cited two workplace regulations in its case – one
that prohibited behavior that endangered the safety and welfare of
patients, and the other that *required* employees to report workplace
violations – to find that the plaintiff had an affirmative duty to
report the fact that her co-workers were mistreating patients and
sleeping on the job.   Citing the affirmative duty contained in the
workplace regulations, as well as plaintiff's own deposition
testimony that "I did my duty. I did my job.... And I wasn't a
whistleblower. I did my job," id. at 275, the court held that the
plaintiff was acting pursuant to her official duties when she made
her complaints.  While acknowledging "the frustration the *Garcetti*
doctrine will impart on public employees such as [the plaintiff]",
the court concluded that it was "constrained to follow the majority
opinion in *Garcetti*."  Id. at 277.

    However,   as  a  number  of  post-Garcetti  decisions  have
recognized, including two from this district issued after Barclay,
an employer cannot exclude all employee speech from First Amendment
protection by asserting that reporting workplace issues is part of
the employee's official job duties.   For example, in Paola v.
Spada, 498 F. Supp. 2d 502 (D. Conn. 2007), the district court held
that questions of fact remained concerning whether a Connecticut
State  Trooper  engaged  in  protected  speech  by  reporting  his
supervisor's allegedly unlawful conduct, reasoning that the record

did not establish that "in carrying out his job duties as a state trooper, [the plaintiff] was expected as a practical matter to investigate or report all potential wrongdoing within the division," 498 F. Supp.2d at 509, even where the Police Departmental Manual stated that "self-policing is an important function," and provided that "[n]o employee shall fail to report information to a superior, which may prove detrimental to the department." Id. at 505. In Drollet v. Demarco, the district court found that Garcetti did not compel summary judgment where a police sergeant claimed retaliation for writing letters to the Police Commission complaining of workplace mismanagement. Drollet v. Demarco, No. 3-05CV1335, 2007 WL 1851102 (D. Conn. June 26, 2007). The court found that there was "no evidence that [the plaintiff's] official duties included complaining about all kinds of workplace mismanagement, whatever the context in which these complaints were made," and stated that even though the Police Department rules required employees to report all matters "of police interest", it did not construe these rules "to *require* [the plaintiff] to make complaints, but only to permit him to do so – that is, there is no evidence that he was employed specifically to make such reports." 2007 WL 1851102, at *5. See also Taylor v. Freetown, 479 F. Supp.2d 227, 237 (D. Mass. 2007) ("*Garcetti* is not meant to strip an employee of First Amendment protection when

36

speaking out regarding issues of serious and widespread public concern, like corruption, just because a garden-variety rule requires him to tell a supervisor.").

Defendants distinguish these decisions from the instant case by arguing that Plaintiff's speech was specifically compelled by his employer, and thus required as part of his job duties. Defs.' Mem. in Supp. of Mot. for Summ. J. at 15 [Doc. No. 76].

As a preliminary matter, the court must distinguish between several incidents of speech at issue – (1) a June or July 2004[3] meeting between Plaintiff and Captain Abbie, (2) an October 2004 meeting between the Traffic Unit officers and Captain Montminy, (3) a February 2005 meeting between the Traffic Unit Officers, Captain Reeves, and Chief Berry and (4) statements Plaintiff made to Lieutenant San Antonio as part of the investigation into Officer Lowry and Dawn Cushman.

Plaintiff does not dispute the fact that he was summoned to the June or July 2004 meeting with Captain Abbie to discuss Sergeant Marvin's behavior, and that Captain Abbie ordered him to speak about Sergeant Marvin's abusive conduct after he indicated that he had no desire to do so. Def.'s Local Rule Statement at ¶¶ 6,7 (Admitted); Ventura Aff. at ¶ 13.

---

[3]From the record, it is unclear whether this meeting occured in June or July of 2004.

The undisputed fact that Captain Abbie called Plaintiff into a meeting and ordered him to speak about his supervisor's abusive conduct against his own wishes indicates that Plaintiff's speech on this issue was "commissioned or created by his employer", and thus, not entitled to First Amendment protection under Garcetti. This interpretation "is consistent with that of other federal courts applying *Garcetti* in similar circumstances, which have interpreted its language to mean that, if a public employee is compelled by his official duties to make the statement in question, the *Garcetti* rule excludes that statement from First Amendment protection, and the employer may retaliate against the employee on the basis of that speech without violating the employee's First Amendment rights." Weintraub v. Bd. of Educ. of the City of New York, 489 F. Supp. 2d 209, 215 (E.D.N.Y. 2007).

However, genuine issues of material fact remain as to whether Plaintiff undertook his subsequent speech concerning Sergeant Marvin's overtime theft and Officer Lowry's criminal conduct pursuant to his official duty as a traffic unit officer. Specifically, Plaintiff has adduced competing evidence contradicting Defendants' claim that he was ordered to speak in the Lowry/Cushman investigation and about Sergeant Marvin's overtime theft, arguing instead that his participation was voluntary, and thus, not made pursuant to his official duties.

Defendants cite three cases from the Eighth Circuit to support its argument that speech made at the request of an employer during an internal investigation falls within a public employee's official duties and is thus not entitled to constitutional protection. See Bradley v. James, 479 F.3d 536 (8th Cir. 2007) (stating that "[a]s a police officer, [plaintiff] had an official responsibility to cooperate with the investigation . . . his allegations . . . were made at no other time than during this investigation, and thus his speech was pursuant to his official and professional duties"); Davenport v. Bd. of Trs. of the Univ. of Arkansas, 5:05cv00213, 2008 U.S. Dist. LEXIS 5424, at *29 (E.D. Ark. Jan 23, 2008) ("further, like the officer in Bradley, it was Plaintiff's duty to cooperate with the Arkansas State Police investigation of [his fellow officer]"); Pottorf v. City of Liberty, 06-0246-CV-W-NKL, 2007 U.S. Dist. 70803, at *23 (W.D. Mo. Sept. 24, 2007) (citing Bradley in holding that a police dispatcher participating in an internal investigation was not acting as a private citizen; although the department's written policy outlining her essential duties and responsibilities did not specifically include giving statements or participating in internal investigations, the policy stated that "[s]pecifications are not intended to reflect all duties performed within the job").

However, at least one district court in this Circuit has held

that speech made by a public employee participating in an internal investigation could be entitled to First Amendment protection, even under Garcetti.     In Casale v. Reo, 522 F. Supp.2d 240 (N.D.N.Y. 2007), a teacher's aide participating in a school district investigation of another teacher accused of misconduct claimed retaliation in violation of the First Amendment.  Both parties agreed that the plaintiff did not initiate the complaint, but was interviewed as a witness after another teacher's aide complained. The defendant argued that the plaintiff's speech fell within her official duties because it did not occur until she was approached by her employer, while the plaintiff argued that her speech was protected because she had not been ordered to speak.  552 F.Supp.2d at 423.  The court found that material issues of fact remained as to whether plaintiff's participation in the investigation was required, and thus, whether her statements were made pursuant to her official duties.   Although it noted that there was some evidence that Plaintiff's speech was pursuant to her official duties (citing, for example, Plaintiff's statement that the school district told her during the investigation that she was a "mandated reporter"), the court found that there was "not enough in the record to show that Plaintiff was actually required to participate, or that she believed she was required to participate . . ." Id. at 424.

In this case, there is evidence that Plaintiff's cooperation in the Lowry/Cushman investigation was compelled by his superiors. For example, when asked in his deposition if he could have refused to speak to Lieutenant San Antonio about Officer Lowry, Plaintiff responded that "a lieutenant wants to talk to you, then it's a direct order". Ventura Depo. at 110 (Pl. Ex. C). However, there is also evidence that Plaintiff was not required to participate in this investigation. See, e.g. Ventura Depo. at 300 (Pl. Ex. C) (Plaintiff's testimony that he later sought out Lieutenant San Antonio and said "I want to give a statement"). Thus, questions of fact remain that preclude this court from concluding that Plaintiff spoke pursuant to his official duties in participating in the Lowry/Cushman investigation.

Questions of fact also remain as to whether Plaintiff's speech regarding Sergeant Marvin's theft of overtime was required by his employer. Plaintiff had already made allegations against Sergeant Marvin's theft of overtime before Chief Berry told him that "we are going to do a thorough investigation and you are going to cooperate." See Ventura Depo. at 152-154 (Pl. Ex. C). Plaintiff also testified that he was the one who "got the ball rolling" before this meeting with Chief Berry by pulling Captain Reeves out of a meeting so that the officers could discuss Sergeant Marvin's overtime theft. Ventura Depo. at 150 (Pl. Ex. C).

The court must also determine whether Plaintiff's speech was on a matter of public concern. "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" <u>Johnson v. Ganim</u>, 342 F.3d 105, 112 (2d Cir. 2003), <u>quoting</u> <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983). "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." <u>Lewis v. Cowen</u>, 165 F.3d 154, 163 (2d Cir. 1999). Here, as Defendants concede, exposing criminal acts within a police department clearly falls within the parameters of public concern. Therefore, Plaintiff's statements concerning the misconduct of Officer Lowry and Dawn Cushman satisfies this test, as does Plaintiff's statements that Sergeant Marvin was stealing overtime from the department.

## B. Whether Plaintiff Suffered an Adverse Employment Action

An action is adverse for purposes of a First Amendment retaliation claim if the action "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . ." <u>Zelnik v. Fashion Inst. of Tech.</u>, 464 F.3d 217, 226 (2d Cir. 2006). "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d

Cir. 1999). This list is not exhaustive, and the Second Circuit
has held that lesser actions may meet the adversity threshold. Id;
see also Morris, 196 F.3d at 110. "In order to prove a claim of
First Amendment retaliation in a situation other than the classic
examples of discharge, refusal to hire, refusal to promote,
demotion, reduction in pay, and reprimand, plaintiff must show that
(1) using an objective standard; (2) the total circumstances of her
working environment changed to become unreasonably inferior and
adverse when compared to a typical or normal, not ideal or model,
workplace." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002).
Determining "whether an undesirable employment action qualifies as
being 'adverse' is a heavily fact-specific, contextual
determination." Hoyt v. Andreucci, 433 F.3d 320, 328 (2d Cir.
2006). "Incidents that are relatively minor and infrequent will
not meet the standard, but otherwise minor incidents that occur
often and over a longer period of time may be actionable if they
attain the critical mass of unreasonable inferiority." Phillips
278 F.3d at 109.

Plaintiff claims that he was subject to the following actions,
and that these actions, either individually or collectively, were
adverse: (1) harassment by Captain Montminy; (2) harassment by
other officers; (3) the no-contact order; (4) Sergeant Beeler's
conduct during the stolen methadone investigation; (4) refusal or

43

reluctance by other officers to provide Plaintiff with backup; and (5) Plaintiff's transfer from the Traffic Unit to the Patrol Unit. Pl's. Mem. in Opp. to Defs.' Mot. for Summ. J. at 21 [Doc. No. 79]. Plaintiff also claims that the retaliation continued after his resignation, because the Town contested his application for unemployment benefits and refused to indicate on his Personnel Activity Form that he was eligible for rehire (although it had done so for Sergeant Marvin). Id. at 8. In addition, Captain Montminy responded "no comment" when asked by the Plaintiff's prospective employer in South Carolina if he would re-hire Plaintiff, and "no" or "no comment" when questioned about Plaintiff's character. Id., citing Pl. Ex. HH.

Defendants' argue that "the alleged adverse employment actions that [Plaintiff] lists in his brief do not independently meet the standard established by the courts in the context of a retaliation claim . . .". Defs'. Reply Mem. in Supp. of Mot. for Summ. J. at 4 [Doc. No. 83].

The court disagrees. First, the Second Circuit has held that an employee may be able to state a retaliation claim for acts occurring after the employee was terminated "if, for example, the company 'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation." Wanamaker v. Columbian Rope Co., 108 F.3d

44

462, 466 (2d Cir. 1997) (internal citations omitted). In this case, although Chief Berry wrote a positive letter of reference for Plaintiff, a rational fact-finder could conclude that Captain Montminy's response of "no" in response to questions about Plaintiff's "reliability, personable, sensitivity, intelligence", and the Town's failure to indicate that Plaintiff was eligible for re-hire meets this standard.

Second, while "a merely discourteous work environment does not rise to the level of First Amendment retaliation," Second Circuit precedent "allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." Phillips, 278 F.3d at 109. In this case, a rational fact-finder could conclude that the incidents cited by Plaintiff, including being denied backup and being labeled as a rat, would deter a person of ordinary firmness from exercising his constitutional rights. See, e.g. Phillips, 278 F.3d at 110 (holding that the plaintiff provided sufficient evidence of harassment, retaliatory conduct, and adverse working conditions, and noting that "[w]hile the incidents-such as defendants' failure to provide her with an adequate bullet-proof vest or proper instruction regarding transfer of a prisoner, or defendants' humiliating instruction to plaintiff about use of a time clock-may seem minor when viewed in isolation, a finder of fact looking at

them collectively over a period of several years reasonably could find that they rise to the level of actionable harm.").

Plaintiff also claims he was constructively discharged because the alleged harassment and retaliation he suffered left him with no choice but to resign from the MPD.

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996). "A court must find a constructive discharge where the employee resigns because an employer causes to exist such conditions of such an unpleasant or difficult nature that any reasonable person in the employee's place would do the same." Flaherty v. Metromail Corp., 235 F.3d 133, 138 (2d Cir. 2000).

Defendants argue that Plaintiff's claim of constructive discharge is belied by the fact that, prior to Plaintiff's resignation, he received favorable evaluations, including a positive reference from Chief Berry when he was looking for unemployment in South Carolina. Defendants also note that Chief Berry transferred Sergeant Marvin out of the Traffic Unit, a move that the Plaintiff characterized as "very positive", and that Plaintiff received a five-month extended vacation prior to his

46

resignation.

However, from the admissible evidence that Plaintiff has put forth, a rational fact-finder could conclude that Plaintiff's work conditions were such that he had "no choice" but to resign.[4]  For example, Plaintiff was told that, upon returning from his leave, he would be transferred to the Patrol Unit, a less desirable position where he would work with and be supervised by the same officers who allegedly called him a rat and denied him backup.  In addition, although Defendants argue that the fact that the other officers in the Traffic Unit did not resign indicates that conditions could not have been so intolerable for a "reasonable person", there is evidence in the record suggesting that Plaintiff was subject to additional negative treatment as a result of his participation in the Lowry/Cushman investigation.

**C. Whether there was a causal connection between Plaintiff's speech and the employment actions at issue**

In a First Amendment retaliation case, "[t]he causal connection must be sufficient to warrant the inference that the

_____

[4]However, Defendants' conduct after Plaintiff resigned would logically be irrelevant to his claim of constructive discharge, because Plaintiff claims that he was forced to resign because of mistreatment that occurred while he was employed by the MPD.  See, e.g. Stein v. New York State Dept. of Motor Vehicles, 841 F.Supp. 42, 50 (N.D.N.Y. 1993) (finding unpersuasive a plaintiff's argument that the court "retroactively consider . . . alleged post-discharge retaliatory [conduct] as proof that [the] discharge was based upon a retaliatory motive.").

protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech. Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (internal citations omitted).

Much of Defendants' evidence supporting their claims that their actions would have been taken absent Plaintiff's speech, and that Plaintiff voluntarily resigned, is under seal and disputed by Plaintiff. After carefully reviewing this evidence, the court concludes that genuine issues of material fact remain as to whether there is a causal connection between Plaintiff's speech and Defendants' conduct, and whether Plaintiff was constructively discharged.

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment on Plaintiff's First Amendment claim.

## II. Municipal Liability under 42 U.S.C. § 1983

A plaintiff who seeks to recover against a municipality under § 1983 must show that the violation of his constitutional rights resulted from a municipal policy or custom. Monell v. Department

of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018 (1978). This analysis applies equally to individual defendants who are sued in their official capacity, as "[a]n official capacity suit against a public servant is treated as one against the governmental entity itself." Reynolds v. Giuliani, 506 F.3d 183, 191 (2d Cir. 2007).

"To establish the existence of a municipal policy or custom, the plaintiff must allege: (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's [rights]; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees." Prowisor v. Bon-Ton, Inc., 426 F.Supp.2d 165, 174 (S.D.N.Y. 2006).

Plaintiff has not alleged the existence of a formal policy. However, he contends that a reasonable jury could conclude that "there existed a custom or practice within the [MPD] of retaliating against officers who cross 'the thin blue line'". Pl's. Mem. in Opp. to Defs.' Mot. for Summ. J. at 26-27 [Doc. No. 79]. The court agrees. As previously noted, Plaintiff has put forth evidence

that, if believed by the trier of fact, would demonstrate that he experienced multiple incidents of harassment as a result of his participation in the Marvin and Lowry/Cushman investigations. In addition, the other officers in the Traffic Unit testified that they were subject to negative treatment as a result of their participation in the Marvin investigation. See, e.g. Barry v. New York City Police Dept., No. 01 Civ.10627, 2004 WL 758299, at *13 (S.D.N.Y. Apr. 7, 2004) (finding that a reasonable jury could find a custom of retaliation against officers who expose police misconduct because "[u]nlike other cases in which courts have found insufficient evidence of a custom of retaliation, plaintiff's witnesses speak from firsthand experience about the blue wall of silence and plaintiff alleges to have suffered a wide range of retaliatory acts as opposed to one discrete instance of retaliation."). Thus, Plaintiff has presented evidence of a custom of retaliation against those violating the "blue line" to support his claim against the Town of Manchester and the individual defendants in their official capacities.

### III. Fourteenth Amendment

Plaintiff alleges a violation of the Fourteenth Amendment by claiming that he was discriminated against "because of the exercise of his First Amendment rights", or in the alternative, that he was "intentionally treated differently from others similarly situated

50

and there is no rational basis for the difference in treatment." Amend. Compl. at ¶¶ 74,76 [Doc. No. 17].

As to Plaintiff's first claim, the Second Circuit does not recognize a claim for retaliation pursuant to the Fourteenth Amendment. See Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996) ("Although claims of retaliation are commonly brought under the First Amendment ... and may also be brought under Title VII, ... we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination").

Furthermore, as explained below, Plaintiff's second claim is no longer viable after the Supreme Court's recent decision in Engquist v. Oregon Dept. Of Agriculture,128 S.Ct. 2146 (2008).[5]

The Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Traditionally, the Equal Protection clause of the Fourteenth Amendment protects against [classification-based] discrimination." Goldfarb v. Town of West Hartford, 474 F.Supp.2d 356, 366 (D. Conn. 2007) (internal quotation marks omitted). In some circumstances, the Supreme Court

---

[5]Defendants have filed a motion to supplement their memorandum in support of summary judgment with the Supreme Court's recent decision in Engquist. As is explained infra, the court finds that Engquist is controlling. Thus, Defendants' motion [Doc. No. 88] is GRANTED.

has also extended the equal protection guarantee to individuals who allege no specific protected class-based discrimination, but instead claim that they have been irrationally singled out as a so-called "class of one". See <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 120 S.Ct. 1073 (2000).

In <u>Engquist</u>, the Supreme Court concluded that a "class of one" equal protection claim is not cognizable in the public employment context. <u>Engquist v. Oregon Dept. Of Agriculture</u>, 128 S.Ct. 2146 (2008). The Court reasoned that a "class of one" theory was a "poor fit" in the public employment context, where "to treat employees differently is not to classify them in a way that raises equal protection concerns, [but r]ather to simply exercise the broad discretion that typically characterizes the employer-employee relationship." <u>Engquist</u>, 128 S.Ct. at 2155. The Court also expressed concern that ratifying such a claim would "impermissibly constitutionalize the employee grievance". <u>Id</u>. at 2157 (internal citations and quotation marks omitted); <u>see also id</u>. at 2156 ("If, as [the plaintiff] suggests, plaintiffs need not claim discrimination on the basis of membership in some class or group, but rather may argue only that they were treated by their employers worse than other employees similarly situated, any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal

constitutional claim.").

Plaintiff argues that <u>Engquist</u> is inapplicable because he "is not claiming that he is a 'class of one'". Pl's. Mem. in Opp. to Defs.' Mot. to Suppl. Mot. for Summ. J. at 1 [Doc. No. 90]. Rather, Plaintiff states that he is one of four officers – the Traffic Unit – who experienced retaliation after participating in the investigation of Sergeant Marvin. <u>Id</u>.

However, ¶ 84 of Plaintiff's complaint, alleging that "the plaintiff was intentionally treated differently from others similarly situation [sic] and there is no rational basis for the difference in treatment", is a recitation of a "class of one" claim. <u>See</u> <u>e.g.</u> <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000) ("[o]ur cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").

Although Plaintiff attempts to broaden his "class" to include the other officers in the Traffic Unit, Plaintiff's complaint clearly focuses on him alone. <u>See</u> Amend. Compl. at ¶ 83 (alleging that Defendants "deprived *the* plaintiff of equal protection of the laws by treating *him* differently from those similarly situated. . .". (emphasis added). In addition, while Plaintiff alleges that

his fellow traffic officers engaged in some of the same conduct that he did, he also alleges that he engaged in additional conduct that subjected him to retaliation – specifically, his participation in the Lowry/Cushman investigation.  <u>Id</u>. at ¶¶ 19-21.

For these reasons, Defendant's motion for summary judgment as to Plaintiff's equal protection claim under the Fourteenth Amendment is GRANTED.

### IV. 42 U.S.C. 1985(3)

Plaintiff alleges that the individual Defendants violated 42 U.S.C. § 1985 by conspiring to deprive him of his rights and privileges as a United States citizen.

To state a cause of action under § 1985, a plaintiff must allege (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws; (3) an overt act in furtherance of the conspiracy; and (4) injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.  <u>Thomas v. Roach</u>, 165 F.3d 137, 146 (2d Cir. 1999). A conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct.'" <u>LeBlanc-Sternberg v. Fletcher</u>, 67 F.3d 412, 427 (2d Cir. 1995) (<u>quoting</u> <u>United States v. Rubin</u>, 844 F.2d 979, 984 (2d Cir. 1988).  However, the plaintiff must show that "'some

racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action.'" <u>Id</u>. (<u>quoting</u> <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798 (1971)).

Plaintiff has presented evidence of alleged retaliation by Sergeant Beeler and Captain Montminy, as well as evidence that Sergeant Beeler was a friend of Officer Lowry. However, he has not produced any proof, circumstantial or otherwise, of an understanding between Captain Montminy and Sergeant Beeler to deprive him of his rights. Even if he had, Plaintiff's asserted class membership as part of the Traffic Unit is insufficient for 1985(3) purposes. <u>See</u> <u>Bray v. Alexandra Women's Health Clinic</u>, 506 U.S. 263, 269 113 S.Ct. 753, 759 (1993) (stating that "[w]hatever may be the precise meaning of a 'class' for purposes of [§ 1985(3)'s extension] beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors.").

Therefore, Defendant's motion for summary judgment as to Count 3 of Plaintiff's complaint, alleging a violation of 42 § 1985(3), is GRANTED.


**V. Qualified Immunity**

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The "threshold inquiry . . . is whether plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002). If they do not, then the inquiry is over. Saucier v. Katz, 533 U.S. 194, 201 (2001). However, "if a [constitutional] violation could be made out on a favorable view of the [plaintiff's] submissions, the next, sequential step is to ask whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001).

A legal right is clearly established if the contours of the right are "sufficiently clear that a reasonable person would understand that what he is doing violates the right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The Second Circuit "[has] interpreted this standard to require three elements: (1) . . . [that] the right in question [be] defined with 'reasonable specificity'; (2) [that] the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were

unlawful." <u>Mollica v. Volker</u>, 229 F.3d 366, 371 (2d Cir. 2000) (internal citations omitted). In a First Amendment retaliation claim, "[t]he relevant inquiry is not whether the defendants should have known that there was a federal right, in the abstract, to 'freedom of speech,' but whether the defendants should have known that the specific actions complained of violated the plaintiff's freedom of speech." <u>Lewis v. Cowen</u>, 165 F.3d 154, 166-67 (2d Cir. 1999).

Even where a right is clearly established, "the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act. The objective reasonableness test is met . . . if officers of reasonable competence could disagree on the legality of the defendant's actions." <u>Lennon v. Miller</u>, 66 F.3d 416, 420 (2d Cir. 1995).

In this case, the threshold inquiry is met because the court has already found that Plaintiff has put forth material issues of fact on his First Amendment retaliation claim.

Furthermore, Defendants' assertion that the contours of a public employee's right to First Amendment protection was not clearly established at the time of the conduct in question (pre-<u>Garcetti</u>) is unpersuasive. "It is clearly established that, although a governmental entity enjoys significantly greater

latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their speech on matters of public importance. The employee's right to be free from such retaliation has been clearly established since at least 1968." Munafo v. Metropolitan Transp. Authority, 285 F.3d 201, 211 (2d Cir. 2002) (internal citations omitted); see also Reuland v. Hynes, 460 F.3d 409, 419-20 (2d Cir. 2006) (reiterating that "previous cases have recognized and defined the First Amendment right of public employees to be free from retaliation for speech on matters of public concern with reasonable clarity.").

Finally, because of existing questions of fact, including whether Plaintiff suffered a constructive discharge, the court cannot determine as a matter of law whether it was objectively reasonable for the individual Defendants in this case to believe that their conduct was lawful.

For the foregoing reasons, the individual Defendants' motion for summary judgment on the grounds of qualified immunity is DENIED.

## VI. Conn. Gen. Stat. § 31-51q

Conn. Gen. Stat. § 31-51q confers liability on "[a]ny employer . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by [the First

58

Amendment or an equivalent provision of the Connecticut Constitution], provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer . . .". Conn. Gen. Stat. § 31-51q. "Courts construing section 31-51q consistently look to federal First Amendment law to determine whether section 31-51q gives rise to a cause of action in the cases before them." <u>Bracey v. Bd. of Educ. of City of Bridgeport</u>, 368 F.3d 108, 116 (2d Cir. 2004) (citing cases).

However, the state statute does not impose individual liability on employees. <u>Sebold v. City of Middletown</u>, No. 3:05-CV-1205, 2007 WL 2782527, at *27 (D. Conn. Sept. 21, 2007). Therefore, to the extent that Plaintiff attempts to bring claims against Defendants Beeler and Montminy in their individual capacities pursuant to Conn. Gen. Stat. § 31-51q, Defendants' motion for summary judgment is GRANTED. Defendants' motion is DENIED with respect to the Town and the individual Defendants in their official capacities.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motion to Strike [Doc. No. 84] is GRANTED IN PART and DENIED IN PART, and Defendants' Motion for Summary Judgment [Doc. No. 75] is GRANTED IN PART and DENIED IN PART. Defendants' Motion to Supplement their memorandum

with recent legal authority [Doc. No. 88] is GRANTED.  Counsel for
the parties are directed to confer and to present to the Court
within thirty (30) days of the date of this ruling a proposed
scheduling order, setting forth a date for the submission of a
joint trial memorandum and a date when this case will be ready for
trial.


                              SO ORDERED


                              /s/ Ellen Bree Burns, SUDJ

                              ELLEN BREE BURNS

                              SENIOR U.S. DISTRICT JUDGE



Dated at New Haven, Connecticut this 29th  day of August  2008.